JOHN T. WILLIAMS et al., appellants,

v.

ESTHER A. OSBORNE, respondent.

A factory situated at U. was complained of by one who lived at S., a mile and a half from U., and 'an injunction was thereupon allowed, restraining defendants from causing a nuisance at U. by their factory.—*Held*, that as no one at U. had complained, the injunction must be modified so as to restrain defendants from causing a nuisance at S. only.

On appeal from a decree advised by Vice-Chancellor Bird, who filed the following conclusions:

The bill in this case declares that the defendants " have commenced the manufacture of a fertilizer at Union Landing, in the township of Woodbridge, about one mile distant from the residence of the complainant, and are now engaged in the business of manufacturing said fertilizer; that the material used in the manufacture of said fertilizer is largely fish, which is brought to said landing in large quantities in boats, in a decomposed state, and is there stored; * * * that said fish are collected in vats, and are then subjected to a boiling process, for the purpose of obtaining a substance called fish oil, and the refuse, by some chemical process unknown to complainant, is converted, by some chemical action or otherwise, into a fertilizer; that the stench arising from said decayed fish, and by said chemical process used in the manufacture of said fertilizer, as well as the fertilizer when manufactured, is, much of the time, so great as to cause nausea, and to render it almost impossible to remain in the neighborhood; * * * that the foul and noxious gases generated, either from the materials used or from the process of manufacturing the same, penetrates the residence of complainant, and she has been forced, at times, to keep the doors and windows closed, and especially when the wind blows from the direction of said factory of defendants, and on several occasions recently, when

the wind has changed at night, she has been awakened by the stench penetrating her bed-room, and she has been nauseated and made sick from inhaling the foul and disagreeable odors generated at said factory; that said gases are not only nauseous and foul, and extremely disagreeable, but extremely unwholesome, but, if permitted to continue, will render her property comparatively worthless, and unfit for habitation."

The prayer of the bill is "that the defendants may be restrained from collecting or storing decomposed fish or other animal matter which creates or causes noxious odors, or any nuisance, and from manufacturing the commodity known as 'fertilizer' in such a way as to cause such odors or nuisances, and from generating noxious, foul and unpleasant gases and stenches at said Union Landing."

One witness for the complainant, who lives a mile distant from the manufactory, visited it, saw the fish-scrap, the potash, the kainite and sludge acid, and describes the odor as offensive; as decidedly unpleasant; so bad that there wasn't a room in the house, from cellar to garret, but what was filled with it, and could be smelled in every room in the house all night long; as a great source of annoyance; a sickening smell; a nauseous smell.

Another witness, who lives a quarter of a mile away, speaks of the odors as very disagreeable; another, living near, says:

"The odor produces tightishness across the chest, and a disagreeable feeling; it is an unpleasant odor, sometimes to a great extent."

Another witness, living three miles distant, says:

"I have smelled it at my house during the past year—very disagreeable odors at times; last Saturday it was almost unbearable; I opened the door, but I shut it immediately; I cannot describe this smell; it is indescribable; it is different from anything I ever smelled before; it is very disagreeable; * * * it is a source of annoyance to my family when we smell it; we have to close our doors and windows to exclude it; we were not annoyed by this smell prior to the time William Clark & Co. began operations here; we had no smell whatever."

Another, living two miles distant, says

Williams v. Osborne.

"I have smelled very disagreeable odors there the last year; * * * I have been very much annoyed by this odor during the summer and fall; we have been obliged to close our doors and windows a great many times this summer; * * * prior to a year ago we were never very much annoyed by this odor; we were never obliged to close our doors and windows, nor were we annoyed by any other odor."

Another, living away two miles, says:

"The smell is a sickening smell, and causes nausea; it has affected me that way when I have left my windows open at my house; on going to bed the smell has come in from the factory and makes me feel sick."

He never smelled these odors before the construction of defendant's factory.

The husband of the complainant, who was sworn February 8th, 1883, and who lives one mile and a half away, says:

"I smelled it as recently as last Saturday; then I smelled it over at my place all through the house; there was only one room that did not smell."

He says that he observed it "a great many times," and gives a number of days. He says:

"It is a very sickening odor—heavy; * * * very disagreeable; it is making our home very uncomfortable; during the summer I have been driven out of my boat-house, where I go in the evening to sit and smoke, and have been obliged to go to the house and close the doors and windows of my dwelling during the summer; once or twice during the summer nights when the windows were open, the smell has been so heavy in the room that it has wakened me up, and I have been obliged to get up and close the windows, therefore making my life very uncomfortable."

Another, living a mile away, says:

"I have been annoyed by the odor at my house; it made my house almost unbearable to sustain."

Another, living only one-quarter of a mile distant, describes the odors in a very similar manner, and says:

"I suppose they came from the defendants' factory, as we never smelled them before."

When asked, on cross-examination, to describe it, says :

" I can't describe it; only it is fearfully offensive."

And when asked whether she knew that it was offensive to all who smelled it, said :

" It is offensive to all I have heard speak of it."

Another, at a distance of a mile and a half, has found it very disagreeable, very sickening; very many times as much as he could do to prevent nausea.

Another, visiting the premises of defendants, speaks of the odor as—'

" Dreadfully offensive; very nauseating, and has a tendency to make one spew; it is a kind of a dull, insipid odor; a heavy, lingering, putrid character."

This witness lives two and one-half miles distant, and says :

" I have observed this odor at my house to the extent that has obliged us to get out of bed in the middle of the night to close the windows and doors, and through the daytime the doors and windows would have to be closed to exclude the smell."

This witness was never so annoyed before the erection of the defendants' factory.

Another, who lives only a mile away, and has been obliged to close his doors and windows to exclude the odor, has smelled the same odor five miles distant. It seems that he rode this distance to his house, facing this odor, and so assured his belief.

Another witness, two miles away, has smelled a bad smell, which he did not notice before defendants commenced carrying on business at Union Landing.

Another witness says :

" It is a mixed odor; acids, decomposition of matter, that has, to my olfactories, the smell of a corpse in a state of decomposing; I have had experience in handling them; I think a dead chicken, or a horse, or anything dead, would have the same smell; you can always smell the acid with them; it creates nausea, a choking-in-the-throat sensation."

Another says :

" The last I smelled it good and strong was two weeks ago to-day ; that was the day of the examination here ; I then observed it as I went home, along the road, on my way home, and after I got home ; I followed it on down to the factory of the defendants, and the nearer I got the livelier the smell got ; I think I did this at your suggestion ; I went beyond the defendants' factory, and then could smell nothing in the direction of the Rahway river ; I went nearly to the Rahway river, and could smell nothing there ; on returning, the nearer I got to the factory the worse it smelled."

Another one spoke of the odor as—

" Very marked and powerful—indescribably nauseating ; I don't know that I have ever smelled anything exactly like it ; it is very offensive."

Another, living three miles away, and having a sick person in his house, and having the windows open to ventilate the house, was obliged to close them because of this odor. He says :

" It is a very dense, vile smell, and would make a person sick who hadn't a strong stomach ; it made this sick person feel very sick, and it was a long while before we were clear of the effect of it in the house."

The complainant says :

" It was a great annoyance ; I first noticed it last spring, and it was worse During the summer, and during the past fall and summer, in has been very disagreeable indeed ; it would be impossible to live there with any comfort ; it was perfectly intolerable ; the character of the annoyance is a dreadful smell ; I can't describe it ; it is sickening ; it is really impossible to have the windows and doors open, no matter how hot the weather is ;  *  *  * last week, on Tuesday, it was intolerable, and our house, with every door and window closed, even, it entered through the air-box of the register, and could be smelled so that we could not sit in the parlor."

In my judgment, this evidence makes a strong case for the complainant. It covers all the requirements of the law as expressed by our learned chancellor. And I think the force of the testimony was felt and acknowledged by the defendants and their counsel. The hearing of the evidence produced by them shows this.

If it is claimed that there appears to be an effort to show that no disagreeable odor emanates from the manufacture of the fertilizer, the value of this testimony, whatever it may be, is more than overcome by the proof that the defendants have undertaken to avail themselves of new machinery, or arrangements, by which they can effectually control all gases and odors and prevent their escape. Indeed, the counsel of the defendants urged the court to act upon the declaration that, as the works of the defendants are now improved, the injunction now pending could safely be dissolved.

This, of course, implies that they are now prepared to carry on their business without committing a nuisance. This, it will be perceived, answers the demands of the law, and coincides with the prayer of the complainant, which is that the defendants, and each of them, be restrained from collecting or storing decomposed fish and other animal matter, which creates or causes noxious odors, or any nuisances, and from manufacturing the commodity known as " fertilizer," in such a way as to cause such odors and nuisances, and from generating noxious, foul and unpleasant gases at Union Landing, in the township of Woodbridge.

I think the complainant is entitled to a decree according to the prayer of her bill, with costs, and will so advise.

*Mr. Edward S. Savage* and *Mr. Miller,* of New York, for complainant.

*Mr. Wm. Brinkerhoff,* for defendants.

The decision of the court (of which the following is a memorandum) was delivered by

VAN SYCKEL, J.

This court concurs in the views expressed by the vice-chancellor, that the defendants below have been guilty of maintaining a nuisance. The decree, however, is too broad, in restraining the defendants from creating or generating any gases or odors, noxious or unpleasant, at Union Landing. The people of Union

Landing have not complained. The complainant lives at Star Landing, one mile and a half distant from Union Landing, and therefore she may not be affected by odors which would be disagreeable at Union Landing. The decree must therefore be reversed for the purpose of modifying it. The defendants must be restrained from conducting their business in such manner that noxious, foul and unpleasant gases or odors are disseminated and become a nuisance at Star Landing. Costs will not be allowed to either party in this court. There is no doubt that the decree would have been modified in the court below, if the attention of the vice-chancellor had been called to it.

*Decree unanimously reversed.*